Final case on our call this afternoon is agenda number 22, case number 107-771. Nancy Kean v. Wal-Mart Stores, Inc., et al., Appalachia. Mr. Robinson. Good afternoon, Your Honors. Aaron Robinson on behalf of Plaintiff Appellants, Mr. Russell and Ms. Kean. Well, taking a lead from the other cases, this case may be the smallest case on the docket this afternoon because as to the plaintiffs, we're talking about a dollar or two. But yet, the reach of this case is as broad as the reach of the other cases that the Court has heard today. We are here to construe the Retailer's Occupation Tax and the Use Tax. And if it were simply to look at those two statutes, it might be an easier inquiry. However, the Department of Revenue has promulgated regulations, as it's empowered to do, construing what is meant to be included within those taxes. That, in my view, confounded the Appellate Court, caused them to reach results that didn't make a lot of sense, at least to the plaintiffs, and hopefully caused this Court some concern as well. We start with the simple premise that the taxing codes, as taxing codes, are strictly construed against the government. Both the Retailer's Occupation Tax and the Use Tax tax tangible property, tangible goods. Illinois has had numerous opportunities to consider whether to tax services, and it has not done so. In fact, the Service Use Tax Act was promulgated not to tax services, but to tax the tangible goods that are sold as an incident to the transaction involving services. The shipping charges here are not tangible. You can't touch them, they don't add anything to the product, they simply get the product from one place to another. Illinois courts have dealt with cases involving shipping transactions, and in some cases they have said, well, yes, it's included in the overall price of the good. Harkening to some degree back to the Retailer's Occupation Tax definition of selling price, which is defined as the consideration, valued in money, or services, or other items that really don't apply here, and shall be determined without deduction on account of the cost of the property sold, the cost of the materials used, labor or services, or any other expense whatsoever. Well, the troubling part of that language, the part that the appellate court and the trial court found troubling, was the potential breadth of any other expenses whatsoever. And reading that in its broadest possible sense, that means anything, regardless. Now, if that were the meaning of the legislature, of the words, any other expenses whatsoever, if they didn't modify anything else, then there would be absolutely no need for cost of materials used, labor or services, cost of the property sold, at all. Because it would be encompassed within any expense whatsoever. So it is clear, by reading the sentence in context, that those expenses that the legislature was talking about are expenses related to bringing the goods to market. Because they didn't want to come up with a laundry list and say, well, it's only those four items that go into the cost of bringing our product to market that aren't deductible. It's any other expenses whatsoever within the context of bringing your product to market. The shipping charges here are not bringing your product to market. They're getting your product away from your market. And because the legislature has had numerous opportunities to tax services and hasn't chosen not to do so, perhaps out of a concern, though it certainly was reserved in the Constitutional Convention, that it shouldn't be taxed here. It's a fiction to tax services here because they are provided by the third party. And no one that I am aware of has ever disputed that if the plaintiffs call up UPS and ship a package, that's not taxed. There's no sales tax on that shipping charge. If the plaintiffs had called up UPS or FedEx and said, go to Walmart and pick up my Leapster and bring it to me, that charge wouldn't have been charged. It wouldn't have been taxed. Ms. Robinson, with regard to that and putting the product in the marketplace, does it make any difference that this was an Internet purchase versus that they could have bought the same item at a brick and mortar Walmart? I think it does to some degree because it gets into the appellate court analysis and something that we can jump to that we're going to be talking about in separable link, and I don't know if you want to get there right now. But the plaintiffs could have gone to a Walmart and bought it. They could have gone to other stores and bought it. They could have ordered it from a catalog. And then at the bottom of the catalog form, paid, shipping, and handling, and the department previously took the position and wrote it expressly into their administrative code, that even though that's one transaction and you write one check and you send in one envelope to order the product from the mail order catalog, that's a separately agreed to agreement on shipping and handling, and it's not taxed. Is there any difference between the telephone, the use of the telephone and the use of the Internet? If one is taxed, should the other be taxed in reverse? Frankly, I'm not aware of the tax specifics on telephone charges. And I'm not trying to evade your question, but if the legislature has declared telephone services as a tangible good, which is subject to tax. Is there a private letter ruling on the use of the telephone? I'm sorry? If there were a tax on the use of the telephone versus a tax on the use of the Internet, that would be appropriate, because the shipping charge isn't the use of the Internet. If there were a charge on the Internet services if you used a telephone as opposed to a broadband or some other form of communication, that's not the charge we're talking about. And I'm not saying it's not within the legislature's province to define services that are taxable or to make services taxable. But at this point, absent any specific regulations, they have chosen not to do so. Counsel, I have a preliminary question. The plaintiffs here did not protest these taxes at the time they made this purchase. Is that correct? Technically, yes, but no. They both protested in the generic term. They both complained on the day. Cricket King wrote to Walmart that day or the next day and said this should not be taxable. But this is after they made the purchase. This is after they made the purchase, because there was no real way for them to protest when you're filling out the form on the Internet. When they made the purchase, they paid the tax, didn't they? Yes, they did. Isn't there a voluntary payment doctrine that would come into play at this point? No, there wouldn't be for a number of reasons. The voluntary payment doctrine does not apply in a number of different circumstances. The most noticeable one, which is duress, and we are not claiming that this product is a necessity, so we're not going to get into that analysis of whether this is a necessity or whether even the Internet to buy products is a necessity. I don't think we have to go there. But even if they made their payment, you get into the Disposition of Monies Act, which is commonly referred to as the Protest Act in Illinois, and both plaintiffs attempted to protest the tax by complying with that statute. And in Crane Construction, this Court said that that was the appropriate procedure to protest a tax payment, even after you've made it, that as long as you followed the Protest Act,  so yes, they protested the tax within the meaning of Crane Construction. The trial court found that Mr. Russell's protest was properly made. He found that Ms. Keene's protest was not properly made, because she didn't know when Walmart was going to take the money and pay it over to the Department of Revenue, and they came into court, and even though they had the money at the time she filed her complaint, after she filed her complaint, they paid the money to the Department of Revenue, and they argued that she was barred by the Voluntary Payment Doctrine, because they had already paid the money over. Rather than dispute that, and she did oppose that, Russell filed his intervening complaint and followed the procedures and had a hearing on a TRO prior to the payment of the monies to the Department of Revenue, which was in complete compliance with what this court said in Crane, as the proper procedure to follow to protest a tax payment as a consumer. Now, with all of that said, it is our position, and none of the lower courts ever reached the issue, they all decided the case on the merits, that the process that these plaintiff consumers have to go through, when they're not having the ability to not write the check to the Department of Revenue, the ultimate tax collecting body, even though they did make the payment to the state's agent, that due process concerns come into play. And this court has considered on numerous occasions the Voluntary Payment Doctrine. However, in our research, we have not come across a case where this court has considered the Voluntary Payment Doctrine in light of the Supreme Court of the United States decision in McKesson. And McKesson talks about there having to be a meaningful, in time, place, and manner, ability to obtain concrete relief from a tax payment. And if that tax payment is, if that relief is post-deprivation, meaning after you pay the tax, you then apply for a refund or file a lawsuit against the state, or whatever the process might be, depending upon who the plaintiff is, then that means the due process attaches and you have to have a meaningful opportunity. We don't think that occurred here and that the due process would be violated if the plaintiffs aren't allowed to proceed to the merits of this case, because they did everything that they could possibly do to protest this tax and obtain a ruling. They filed their suit for the injunction. They followed Crane to a T, at least Mr. Russell did. And three days before Wal-Mart was going to make that payment, the trial judge not only denied the injunction, but he ruled on the merits of the case. And an immediate appeal was taken. That day, the notice of appeal was filed. And an emergency motion was filed asking the appellate court to stay that order so that the case could proceed. They didn't do that. They issued a ruling the following Monday, technically two days after the tax payment was going to be made, and denied the emergency relief. The case was remanded, and then Judge Bronstein basically said, I've already found the tax is valid, I'm going to find it's valid again, so you don't have a cause of action either, because the first proceedings were on the merits. Now, the department has argued here, and they've argued in the appellate court, that because we didn't get that injunction, we've now all of a sudden, having not voluntarily paid under their own admission in the trial court, now we've voluntarily paid. And if that were an appropriate legal tool to knock someone out of the box, so to speak, on the voluntary payment doctrine, then I don't think due process is being met, and I don't think McKesson is being followed, because the protest act itself is written in retrospective terms. It doesn't say, hold on to your money, don't pay the tax, file a lawsuit. The protest act itself says, pay the money to the Department of Revenue, then go to court, get an injunction, keeping the Department of Revenue from transferring the money into the general funds. So the protest act itself is written in post deprivation language, and therefore McKesson requires that the plaintiffs have a meaningful opportunity to oppose the tax. And whether they be knocked out at the trial court level or at the appellate court level, I don't think that's a meaningful opportunity to have to get an injunction within 30 days in the trial court, and then perhaps on a three-day appeal, if that, on an emergency motion in the appellate court, get an even more difficult injunction to obtain. And if that is applied in the manner that the department wants, then the merits of these cases will never be reached, because there will never be a time to do it. If this were to occur again, with the appellate court ruling standing out there, they're going to say, well, the tax is valid, because the appellate court reached the merits, though you could reverse them on that ground and say dismiss on voluntary payment, in which case there would be no merits decision out there. But it would be very difficult for the courts to ever have an opportunity to consider these issues or whether the tax is valid, at least from the consumer, the used taxpayer's standing, because the retail or occupation taxpayer could perhaps say, I'm not going to pay you, department, I'm going to file my action, because he may have a little bit more leverage, because he's the one that's actually making the payment into the department's general revenue fund. So I do think that we did protest properly under Illinois law, and that the voluntary payment doctrine doesn't bar our case. Now, as an aside, we've argued that due process and voluntary payment don't apply. We've given the courts some law to indicate that perhaps what happens isn't a voluntary payment. This admittedly involuntary payment in the trial court doesn't all of a sudden become voluntary because you didn't get your injunction. You did everything you could to protest. Perhaps the terminology should be it becomes moot because you didn't get your injunction. Now, while we disagree with that and we think that the same due process concerns apply, the mootness doctrine has a number of exceptions to it to allow the courts to consider what are otherwise legally moot issues and reach the merits. And the department has never addressed those before this court. They don't address them whatsoever. You know, those factors, likelihood of it being repeated, the need for guidance, I think given the diaspora of case law that we have here on these issues, there is certainly a lot of need for guidance. And as we've indicated, merchants in Illinois should have a level playing field to know how to do business because we know and we've introduced evidence into the trial court at the injunction hearing that some merchants in Illinois are not charging sales tax on shipping charges on their Internet transactions. Some merchants in Illinois are not charging sales tax on mail order transactions. And these are relatively large merchants. They're not small mom and pop shops. They're national chains. So to the extent that the court were to find that the case was moot, you know, we would implore the court to consider the merits of the case anyway, as the lower courts have done. In addition to the surplus or surplusage that would exist in the retailer's occupation tax language, if we read any other expenses whatsoever so broadly, I think that this court has formed a proper analysis for analyzing the tax here as to the third-party shippers. And that was done in canteen court. It's not a shipping and handling case, and we're not saying that it was. But what the court did was it said you've got these bags of potato chips, cans of pop, whatever coming off the assembly line, they're going to a warehouse, they're being sold to a vendor, a distributor, and they're being taxed as merchandise once they finally make it to the market. And there's really nothing inherently different about those products that they should be taxed differently if one is put into a vending machine by the job guy, jobber, and the other is sold to the convenience store down in the lobby of the building. So same product, different tax. Got to there the exact same way on the exact same truck in the exact same building. We see no reason why that analysis shouldn't be applied to a third-party UPS shipping agreement. There's an agreement. No one disputes that there's not an agreement with UPS. UPS is shipping it, not Walmart. And if I called UPS and shipped it, it wouldn't be taxed. If Walmart linked me to the UPS or FedEx or whomever, DHL's website, and I arranged with UPS to ship it, it wouldn't be taxed. No one has ever said that it would be. In fact, they kind of argue that it wouldn't be. But now all of a sudden, because Walmart is acting as a conduit, as an agent so to speak, to enter into a separate agreement with UPS for shipping, then all of a sudden that shipping becomes taxable. It's the same shipment. It's on the same truck. It's going to the same place. And there's no reason in logic that the legislature intended to tax UPS' shipping in one instance and not in the next. Now, the appellate court seemed also to get caught up in the language of two sections of the Administrative Code, 130.410 and 130.415. And they looked at this last sentence of that Section D. There are five sections. They all deal with situations where there's a separate agreement. They all say you don't have to have a separate contract. You don't have to have a separate form. You can list it all on one invoice. Those aren't determinative. But as long as there's a separate agreement for shipping, the shipping isn't taxable. Now, that language came to being after a couple of cases. I see that my time is up. If I could finish this thought and then sit down. Shortly. Shortly. Those cases came to being after the Department put in language expressly saying that mail order transactions and shipping on the same form were not taxable. And all they did was take out the words mail order and didn't change that provision whatsoever. We don't think the results should be any different. And we ask that Your Honors reverse. Thank you. Your Honors, with this Court's indulgence, Mr. Scheller and I are going to switch the order of arguments given the nature of the appellant's opening statement to your questions. You're certainly allowed to do that, but you're on your own as to when you make the switch. Got a special watch set for it. We'll see. Exactly. Not the first special watch that's gone to that podium. Thank you, Your Honors. My name is Brett Lagner. I'm an Assistant Illinois Attorney General, and I represent the Illinois Department of Revenue and the State Treasurer in this case. May it please the Court, Counsel. Your Honors, the voluntary payment doctrine bars the plaintiff's claims in this case. This Court in Wexler made clear that where a tax is voluntarily paid, it can only be recovered where authorized by statute. In Wexler, this Court went on to specify that statutory compliance is a prerequisite to a taxpayer's right to defend against a particular tax levy, and the burden of showing compliance rests on the taxpayer. That includes complying with the procedural minutia of the statute. In Wexler, the Court specifically talked about the requirement to comply with the notice provisions of the Protest Fund Act, citing the appellate court's Yellow Freight System case. That's also consistent with this Court's decisions in Carpentier, quoted throughout the defendant's briefs, the 1953 decision, which also quoted and cited the Ward and Company v. Stratton case from this Court in 1930, all for the proposition that to recover a paid tax, the taxpayer must comply with the statutory mechanism provided. First step in this case is determining whether the payment was voluntary, and it was. Under this Court's decisions and the appellate court's decisions in Illinois, a tax payment is involuntary in one of two situations. One, where there is duress, and two, where there is a lack of knowledge. In this specific context, duress means that the item purchased concerned a necessity of life, or where there was no other option to purchase the item. Clearly, the mini trampoline and the electronic learning device in this case were not necessities of life. Wasn't that the case in Geary v. Dominick's necessity? In Geary, there was... Medical appliances. In medical appliances, yes. There was a necessity there. There was a necessity in the ghetto case, the Ghetto v. Chicago, which was phone service. There was no necessity, for instance, on discount taxes, on discount coupons for groceries, and for other items. That's the Uzinski v. Dominick's foods case. So this Court requires some sort of necessity for there to be duress, or alternatively, no reasonable option to purchase the items elsewhere. Here, there is a reasonable option to purchase the items elsewhere. Plaintiffs admit that they could go to a brick-and-mortar Walmart store and get the items. Walmart.com was not the only place to buy these items. There was no duress. Furthermore, there's no claim, there's no reasonable claim for lack of knowledge. Under this Court's Freund v. Avis Rent-A-Car case, where the tax is itemized, set forth, and the taxpayers provided sufficient information to discern what is taxed and how much the tax is, the taxpayer has adequate knowledge to form the basis of a protest. That was certainly the case, looking at the invoices in this case. So, the tax was voluntarily paid. To recover, the plaintiffs must require, with the procedure authorized by statute. That procedure in Illinois is the Protest Fund Act, made applicable to the plaintiffs through the Korean Construction Procedure, under which the plaintiffs must sue the actual taxpayer. In this case, a tax remitter, Walmart. The plaintiffs pay the tax to Walmart. Walmart then remits the tax to the state. So, Walmart is technically the taxpayer remitter as far as the state is concerned. The plaintiffs must sue Walmart to enjoin them from paying the taxes to the state other than under protest to the state. As part of that, and this is where the Protest Fund Act procedures come in, they must obtain an injunction. Simply claiming a protest and asking the court, look, I've paid this tax under protest, paid a protest fund. Simply claiming that is not enough under the statute. The statute actually requires the party to obtain a preliminary injunction or a temporary restraining order, preventing those monies from being turned over to the state's regular revenue fund within 30 days. Mr. Langner, under this scenario of a purchase online, what should they have done? Would they have had to go to court to enjoin before they actually made the purchase? No, Your Honor. In this case, they did at least what Russell did was the proper method. Pay it online and then file a suit against Walmart to get them to create a protest action to stop the tax from actually being paid into the state revenue fund, regular revenue funds. So Russell followed the clean construction procedure, except that he did not obtain the injunction. The failure to obtain the injunction resulted in the tax being paid into the state's regular revenue fund. At that point, the statutory right is foreclosed and the voluntary payment doctrine bars any relief. Even if this court determines that the denial of that injunction was an error? Even if this court determines that the denial of that injunction was an error, that's correct. So what is it that a purchaser could do differently, at least for Mr. Russell, than what he did to try and preserve that right? Prevail at the preliminary injunction stage. It shows the importance of the preliminary injunction, but the Protest Fund Act specifically makes that clear. It specifies that to proceed to a decision on the merits in a Protest Fund Act case, the party has to obtain the injunction within 30 days. Otherwise, the payment goes into the state's regular revenue fund. I want to touch on something that Justice Kilbright asked us. So there's really no appellate remedy for an erroneous ruling at the preliminary injunction or TRL stage? In this case, Russell availed himself of the appellate remedy. He saw an emergency injunction. You can appeal under an expedited ruling, either under 307A or 307D, to the appellate court on an expedited basis. If it's a denial of a TRL, then you have the two-day briefing. You could also ask the court for a stay, in effect, to give them an injunction pending the resolution of the emergency appeal. Right. And at that time, it's still not into the general revenue fund. Correct. But by the time it reaches us, if we decide to take the case, it's in the general revenue fund, so there's really no remedy. Correct. Unless absent obtaining a stay or an injunction, that is true, Your Honor. They could obtain a stay or an injunction, seek a supervisory order, something along those lines from this court on an emergency basis. But it's no different than many other types of case where a party's failure- That's a good point, though. After the denial of the relief at the appellate court, they could seek a supervisory order in this court if there was still time. Correct. Before the monies went into the fund. Yes. I heard you use the term due process, and I suspect that was going to be to answer the suggestion by counsel during his argument. That's exactly right, Your Honor. I'm giving you the same invitation. Thank you. Due process is satisfied in this case. McKeeson, the McKeeson case, only requires a meaningful opportunity and a remedy to obtain the tax that was paid that is challenged. The Protest Fund Act provides that. This is not a post-deprivation remedy. It's a pre-deprivation remedy in the sense that it's a remedy that the taxpayer can avail itself of before the tax is paid into the state's revenue fund, as opposed to filing an administrative action for a tax refund after those taxes have been paid. Under this, the parties get a hearing. They get to bring their claims on the merits before the court if they obtain the injunction. And again, in this case, Russell obtained a hearing not just before the circuit court, but also was able to file an appeal in the appellate court. That is a sufficient hearing, opportunity to be heard. And if he would have been successful in obtaining his injunction, in obtaining the injunctive relief, then he could have proceeded to the merits. His failure to do that is tantamount to a failure of one of the provisions of the Protest Fund Act. But the fact remains that McKeeson's requirements are met because there was a mechanism by which the plaintiffs could avail themselves. It didn't work for them. They were not able to obtain the relief. But simply because they were not able to obtain the relief doesn't mean that there was not a mechanism there that they could avail themselves of. And again, this court has been clear that the failure to comply with the statutory mechanism for recovering a voluntarily paid tax, the failure to comply with that mechanism results in the lack of standing or the failure of the ability to challenge that tax any further. Plaintiffs do not mention at any point the countervailing interest that exists in the state's right and the hardship to the state's budget, the operation of the state FISC, that would otherwise engender. That's why these voluntary payment doctrines and the Protest Fund Act with its quick timeframes are in place. It imposes a definite hardship for the state to collect taxes and then have those taxes, once transferred to the Revenue Fund, constantly subject to challenge. The state would never know how much revenue it has. In an effort to provide some certainty, the General Assembly has provided this procedure, which, again, provides for hearing which the plaintiffs got. Again, in this case, they were not able to obtain an emergency injunctive relief, but that doesn't mean there was no due process. There's many times in which a party is unable to obtain an emergency injunction and something happens and they are no longer able to vindicate certain rights. The failure to obtain injunctive relief is not dispositive. The fact that they had an opportunity to obtain injunctive relief to stop this money from going to the state's regular Revenue Fund is what is dispositive for due process purposes. Your Honors, my magic watch tells me that it's about time for me to turn it over to Mr. Schiller for discussion of the merits. I will just, if there's no other voluntary payment doctrine questions, I would just introduce the merits argument by stating very simply that this is an easy case. Section 1 of the Retailer's Occupation Tax Act defines the taxable selling price as the amount of consideration received for a sale without any deduction for any expense whatsoever. The Gaper's decision cited throughout the party's briefs quoted this court's 1942 decision in Valso and Streigel v. McKibbin, which found that provision to be without any ambiguity and acknowledged explicitly that no other expense whatsoever language is all-embracing in its scope under the plain language of that statute. The shipping charges were a cost of doing business to Walmart.com and thus taxable. I'll now turn over the podium. Thank you, Your Honors. May it please the Court, Counsel. My name is Arthur Schiller. I represent the Walmart Defendant's Appellees in this case. This case, as Mr. Legner said, is very simple. It turns on the fact that these Internet purchases here could not be completed. They could not have been consummated without a delivery charge. There was one contract in this case. It included both the price of the item and the delivery charge. That's the selling price and that's what wrote a taxes. Now, what plaintiffs argue in their briefs and what they started to argue earlier is that they argue that they're exempt under a And that exemption is that delivery charges are not taxable if they're separately contracted for. The problem with that argument, though, is it's belied by the allegations, the factual allegations of plaintiffs' complaints. Plaintiffs have alleged in their complaint that the first thing they did at the Walmart.com website was click on an item and put it in their electronic shopping cart. If we're to buy plaintiffs' theory that there's two separate contracts, at the moment they put that item into their shopping cart, this court would have to conclude there was an enforceable contract for the purchase of that item because the next step is a choice of delivery on the website. So if there's two separate contracts, we'd have to conclude that by putting it into your cart, there is an enforceable contract. And, of course, there is no enforceable contract because plaintiffs are free to take the item out of their cart and put it back onto the shelf. Now, the allegations of their complaints show that there was a number of inseparable links in this transaction. Plaintiffs went to the website, selected the item, select delivery. They put their credit card information in. They go to another webpage that is a confirm and submit webpage. And at that webpage, they have a chance to review their order, make any changes that they'd like to make. And if they decide to make a purchase, they click a button at that point, submit your order, and that's the purchase, and then their consideration is paid through their credit card. Ms. Keene was going to get her trampoline. She had to do what she was instructed to do by the webpage, isn't that correct? That is correct, Your Honor. There is no option on walmart.com's website. You are required to select delivery in order to make a purchase. One credit card to pay for all the facets of the sale. That's correct. And as the appellate court noted, that one credit card transaction suggests and really demonstrates this was one transaction. It wasn't two separate contracts. And payment was a prerequisite. Payment of the delivery charges was a prerequisite to transfer of ownership of title to the goods. The only true option that the purchaser had was to disconnect from the internet. That's correct, Your Honor. That's correct. That was their only option. Is there any significance to that fact in this case? No. They could walk away from that. It is significant in the sense that, yes, the transaction is not complete until they click the final button of their mouse. And when they click that final button, they make their purchase, they submit their consideration, and they take ownership, title to the goods. Mr. Sheller, does that mean that the inseparable link is the proper test? Yes, Your Honor. The case law, the inseparable link case law, is the proper test. And contrary to plaintiff's arguments, that is firmly embedded in Illinois jurisprudence, that concept. In fact, they cite the Mahan case from 1941 for the proposition that the statute should be strictly construed against the government. And that case actually talks about an inseparable part. If something is an inseparable part of a sale, then it's taxable. So all the way back to 1941 in the Mahan case. And this court, of course, addressed inseparable link in the materials service case in 1983. And in the materials service, just as an aside, they said that this court said if delivery is an inseparable part of the sale, it's a cost of doing business. And it's part of ROTA. Now, plaintiffs, and I want to cover a few more points before I run out of time, but they argue this Canteen Corp case in their briefs, and they rely pretty heavily on that case. That case actually undermines them because it stands for the well-settled proposition that the department's regulations can neither expand nor limit the scope of a statute. And in Canteen Corp, this court found that one of the department's regulations was inconsistent with the statute. And in this case, we have a very clear statute. And the regulations, we believe, support our interpretation of the statute when they're construed as a whole and not in the piecemeal fashion that they suggest. But they're asking in their argument for you to read the regulations broadly and to vary the language of the statute. And we're just simply saying read the regulations consistent with the statute, as we should do. Mr. Scheller, is Mr. Robinson correct that if his clients had the option to contract separately, directly with UPS, there'd be no tax on that contract? That's right, if they had that option. And actually, it's a wonderful hypothetical, Your Honor, because... Well, that's my next question. If Walmart arranged the architecture, the structure of this purchase thing, you know, here's the purchase price, here's the tax on it now, here's what go to UPS, make arrangements, and they'll pick it up and deliver it to you. That's correct, Your Honor. We could certainly have done that, but that's not the facts of this case, and that's not how we've set up our Internet website. But, I mean, the way this sale was completed was the way Walmart set it up. That's correct. And why does it make a difference one way or another to Walmart? You don't gain any benefit, do you? Well, you know, it's my speculation. I'm only speculating. I think the benefit to Walmart is, of course, Walmart's interested in keeping our costs down. And I think by setting up an option to have it picked up at a brick-and-mortar store may entail more, you know, rent, more space, more personnel. But that's, you know, my speculation, Your Honor. But isn't it a benefit also to the plaintiffs not to have to go to the brick-and-mortar store to have the option? That's absolutely correct, Your Honor. It is a benefit. They get the interest on the money, too, right? I'm sorry? They get the interest on the money until they have to turn it over to UPS. That's right. And in terms of UPS, it's just... But that's one of the things that they're probably doing, right? I'm sorry? I mean, they get the interest on the money until they have to turn the money over to UPS. And who knows what arrangements they have? That's correct. And I think the hypothetical, Your Honor, points to the fact, really underscores, that they didn't separately contract here. When they say in their brief, if only Walmart, you had set it up differently and we could have separately contracted, it tells you that they did not separately contract. And, in fact, in the trial court, co-counsel, not Mr. Robinson, admitted that they could not purchase the product without the service. The judge asked him, can you purchase this product without delivering? He said no. Counsel, I'm afraid your time is up. Thank you very much, Your Honors. We ask that the trial and appellate courts be affirmed in this case. Thank you. Finally, Mr. Robinson. Thank you, Your Honor. Counsel, I'd like to address things in reverse order. Perhaps this battle boils down to inseparable link versus selling price. That might be how this court will determine the issue. I'd like to discuss that. All of the inseparable link cases that anyone has cited have been cases where the merchant himself or itself was providing the service that was considered to be an inseparable link. Would that be the case if those merchants in every one of those inseparable link cases had contracted with an independent third party to perform it? Terrace Carpets seems to say no, yet the appellate court seems to go the other way. Counsel cite Terrace Carpets, but yet they're asking this court to basically disregard what the Terrace Carpets court said because they talked about if there were a separate agreement for the installation of the carpeting, it wouldn't be taxed. But in most of those cases, gapers, et cetera, this is really all one transaction. Gapers, you bought in-home catering service. Material services, you had cement delivered in their truck. Here we have a third party. That's a substantial distinction. But let's take a look at the word selling price because they say this is one transaction. And by the way, as an aside, why is it any less one transaction if you elect internet shipping and you had the option to pick it up at the store? You fill out the exact same form and instead of saying I'm going to pick up the product at the store, I'm going to get it shipped to me. Yet they have all argued in their briefs and the appellate court said as well, if you have that option to pick it up in the store, this contract between Walmart and UPS or between the plaintiffs and UPS suddenly becomes a separate contract. How is it any less of a separate contract in that situation than it is in the former? It isn't. Maybe I'm confused. Are you saying that you have the option of either having it delivered via UPS or making an option to pick it up at the store but you pay the same tax? No, and that's their position. If you have the option of picking it up at the store, it's a simple option, not that you do it, but you have the option of picking up the product at the store, then defendants and the appellate court said that shipping charge is not taxed, even if you elect shipping. It's no less of one transaction. It's the exact same truck. It's the exact same bells and whistles. But simply because you had the option of picking it up at the store, all of those things all of a sudden become a separate agreement. But let's look at selling price because if you buy something, you pay the selling price, right? And if you take it back, you get the selling price back, don't you? Well, not in this case. And that's an important distinction. You don't get your shipping agreement price back if you take the product back. If you send it back to Walmart, you're refunded only the price of the product because the separate agreement that you've entered with them for shipping for a separately ascertainable price doesn't get refunded. And it's not just if you take it back to the Internet. If you take your product back to the local Walmart store and say, you know, I got these drapes in and they looked really nice online, but they just don't go with my sofa. The tint is off, the green is off, or the blue is off. I want to return them. Well, you've had this product shipped and you've paid to have it shipped. What does Walmart give you back when you take it back to the store? The selling price, the whole thing? No. You don't get your shipping price back. And that's why this distinction in RODA and in the department's regulations talks about the selling price and a separately ascertainable agreement for the cost of the shipping. Because in one case, the merchant is making it a part of their cost of doing business to say, we'll send you this shipping included. And if you send it back as a cost of doing business, they're going to have to pay for that. But if they've got two separate agreements and you bring the product back, and maybe that's why Walmart does it, they don't have to pay you the shipping back. Because you didn't pay them for the shipping, they just passed the cost through to UPS. Now turning to the voluntary payment doctrine, perhaps this is a battle about pre versus post deprivation. McKesson says, citing an early 1900s case, that if you are relegated to paying the tax and then seeking post payment relief, that that is a payment under duress. Therefore, the voluntary payment doctrine doesn't apply. The mootness doctrine doesn't apply. And McKesson uses that word intentionally. And it comments that perhaps the courts aren't quick enough to realize this, but that is a payment under duress. If you have to pay the money and then go into a refund process, and we're not saying we didn't have a refund process, but that refund process shouldn't be cut off at the trial court stage. That is not a meaningful opportunity to relief. It's a roadblock. And not one of the voluntary payment doctrine cases that I have come across has involved a case where you didn't get the injunction. Actually, there is one, and that's Leafblad, which we both cite. And Leafblad said, no, they protested the tax, they did everything they could, but we're not going to say it wasn't a voluntary payment. Now, they went on in that case to say perhaps it's moot, but that's something they don't want to talk about because they don't want the court to reach the merits of this case. We think that allowing someone effectively two days to get an emergency injunction in the appellate court, to have the ability to ask the court to review the merits of a trial court ruling is not a meaningful process in time, place and manner for a consumer to get their portion of the use tax back. Here we had a willing participant. Walmart, for whatever business reasons it wanted to, said we're going to pay this money and therefore we're going to cut you off at the knees and not give you the opportunity to pursue your relief. We should be giving a meaningful opportunity. This court should give us that meaningful opportunity to consider this case on the merits. And when it does, look at the fact that there is a third-party agreement. Not one of the other cases dealt with third-party agreements. Look at the definition of selling price. We don't get our money back if we send the product back. It's not part of the selling price. Alleged in our complaint is a separate agreement for shipping. And if we have a question about our shipping, do we go online and ask Walmart? No. We can call UPS or we can use the link on Walmart's website to UPS's website. So there is a separate agreement here. The fact that there was one invoice doesn't matter. The department said so in Section 130.415 and the terrorist carpets court said so as well. Looking at the language of the Retailer's Occupation Tax Act, the language, any other expense whatsoever, if read as broadly as defendants suggest, means that all of the other criteria listed above it that were put in there for some reason by the legislature never had to be there in the first place. We suggest that that's contrary to statutory construction and that the reason that language is in there to cover other types of expenses of doing business internally, not externally through third-party agreements. And for those reasons, we ask that Your Honors reverse the rulings of the trial and appeal the court. Thank you. Case number 107771 will be taken under investigation.